No. 95-2218

United States of America,  *
                              *
        Appellee,            *
                              *  Appeal from the United States
     v.                       *  District Court for the
                              *  Eastern District of Missouri.
Barney L. Sandow,            *
                              *
        Appellant.           *


Submitted:  January 10, 1996

Filed:  March 12, 1996


Before BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges, and KYLE,[*] District
    Judge.


MORRIS SHEPPARD ARNOLD, Circuit Judge.


    Between 1981 and mid-1993, Barney Sandow worked as an insurance agent
(representing insurance companies in selling policies) and an insurance
broker (representing individuals in buying policies).  In 1990, he
persuaded one of his individual customers to pledge an annuity worth over
$100,000 as collateral for a bank loan to a person unknown to the customer
but vouched for by Mr. Sandow; in return, the customer was supposed to
receive income from what was described to him as interest on the annuity
of at least 12 percent.  The borrower (who turned out to be Mr. Sandow
himself, although his customer was unaware of that) defaulted on

---

[*]The HONORABLE RICHARD H. KYLE, United States District
Judge for the District of Minnesota, sitting by
designation.

the loan, however, and the bank sued to foreclose on the annuity. Mr. Sandow then instructed the bank to cash in the annuity; the bank applied the proceeds to pay off the loan and sent the surplus to Mr. Sandow, who never returned any money to his customer. Those events were the subject of one federal indictment against Mr. Sandow (which, for simplicity's sake, we call the annuity pledge case). That indictment contained two counts of mail fraud and one count of wire fraud.

A different federal indictment against Mr. Sandow charged that, between mid-1991 and mid-1993, he and several co-defendants were involved in establishing four companies that collected premiums for health insurance but in fact failed to provide that insurance (for simplicity's sake, we call those charges the insurance fraud case). That indictment contained nine counts of mail fraud, two counts of wire fraud, and one count of conspiracy (with his co-defendants). The co-defendants all pleaded guilty, but Mr. Sandow chose to go to trial.

The two cases were consolidated for trial. After an eight-day jury trial in early 1995, Mr. Sandow was convicted on all counts. He was subsequently sentenced to 60 months in prison. He appeals his convictions, contending that the trial court improperly admitted into evidence a professional license suspension, four civil judgments, and a tax lien against him; incorrectly instructed the jury about that evidence; and improperly refused a jury instruction on multiple conspiracies. Mr. Sandow also appeals his sentence, asserting that the trial court incorrectly calculated the loss to the victims and erred in refusing to grant him a reduction in offense level for acceptance of responsibility. We affirm Mr. Sandow's convictions and his sentence.

I.

On the second day of trial, the government sought to introduce documents showing that the insurance department of the state of

Missouri had suspended Mr. Sandow's agent/broker license by consent for three months in 1990. That suspension was the result of a customer complaint that Mr. Sandow had "misappropriated funds, solicited insurance when he was not appointed [authorized by a particular insurance company to sell its policies] and failed to keep his fiduciary duty as a broker." (The customer alleged that Mr. Sandow had accepted $1,700 to buy an annuity for her but never bought one and did not refund her money until six months later. The factual details of the customer complaint were brought out through testimony.)

Mr. Sandow objected, but the trial court admitted the documents under Fed. R. Ev. 404(b), holding that the documents were evidence of "motive, ... intent, ... [or] plan," as permitted by the rule. Although the trial court did not explicitly say so at the time the documents were admitted, the discussion between the trial court and the lawyers suggests strongly that the trial court's ruling related solely to the annuity pledge case. There was no discussion, at the time the documents were admitted, of how, if at all, they might relate to the insurance fraud case.

On the seventh day of trial, the government sought to refer again to the documents showing the suspension of Mr. Sandow's agent/broker license. The government cited those documents at that time as showing that Mr. Sandow lied to various insurance companies, when subsequently applying for agent status, about whether any of his customers had ever filed a complaint against him, whether he had ever been investigated or disciplined by any state insurance department, and whether his professional license had ever been suspended. Mr. Sandow objected, but the trial court allowed the government to refer to that evidence, the court stating that the documents were relevant to the question of intent on the conspiracy count included in the insurance fraud case. See Fed. R. Ev. 404(b).

Although it is not completely clear from his appellate brief, Mr. Sandow appears to concede that evidence of his agent/broker license suspension was properly admitted under Fed. R. Ev. 404(b) in the annuity pledge case. At oral argument, furthermore, Mr. Sandow acknowledged that that evidence was properly admissible in the insurance fraud case to show "intent, preparation, plan, knowledge, ... or absence of mistake or accident," see Fed. R. Ev. 404(b), on the conspiracy count. Given the latter concession, we are unsure whether Mr. Sandow still challenges (as he did in his appellate brief) the admission of those documents in any other respect -- perhaps with regard to the remaining counts in the insurance fraud case. In the interest of thoroughness, however, we briefly address that question.

We do not see the relevance of Mr. Sandow's agent/broker license suspension to the mail fraud or wire fraud counts in the insurance fraud case. Even if that evidence was marginally relevant, moreover, we believe that its probative value was far outweighed by its potential for generating unfair prejudice against Mr. Sandow. See Fed. R. Ev. 403. We conclude, nonetheless, that the error in admitting that evidence was harmless, given the overwhelming proof of Mr. Sandow's guilt on all of the counts in the insurance fraud case. We therefore decline to reverse his conviction in that case for any reason associated with the admission of the evidence regarding his professional license suspension.

During discussion with the trial court about the evidence on the suspension of Mr. Sandow's agent/broker license, Mr. Sandow asked for an instruction, first, that the jury should "disregard the Government's references to [those documents] as substantive evidence" in the insurance fraud case and, second, "that that evidence was admitted ... for the purpose of showing knowledge and intent ... and that [the jury] cannot consider that evidence for any other purpose" in the annuity pledge case. During the jury

instructions conference, the trial court referred to "the [Fed. R. Ev. 404(b)] instruction, which we discussed substantially, and elected to give ... as tendered by the Defendant."  Mr. Sandow made no objection to the instructions at that time, nor did he object when the trial court actually charged the jury.

We see no plain error in the trial court's instructions, and certainly no prejudice resulting from them, and therefore we reject Mr. Sandow's further arguments that the trial court's instruction was too narrow in that it failed to address the insurance fraud case at all and that it was too broad in that it "used the umbrella term 'state of mind'" instead of specifying the exact limits under Fed. R. Ev. 404(b) of the jury's use of that evidence in the annuity pledge case.  See, e.g., United States v. Aranda, 963 F.2d 211, 216 (8th Cir. 1992); see also Fed. R. Ev. 105, Fed. R. Crim. P. 30, Fed. R. Crim. P. 52(b), and 21 C. Wright and K. Graham, Jr., Federal Practice and Procedure:  Evidence § 5065 at 325, 327 (1977).

## II.

On the second day of trial, the government sought to introduce documents showing that Mr. Sandow had had two civil judgments against him and had written checks in late 1990 or early 1991 to pay those judgments. Mr. Sandow objected, but the trial court allowed the documents to be admitted, accepting the government's contentions that they were relevant to show Mr. Sandow's motive for taking money from his customer in connection with the charges in the annuity pledge case.  See Fed. R. Ev. 404(b).

On the seventh day of trial, the government sought to refer again to those two civil judgments and to introduce additional documents showing two more civil judgments and a federal tax lien against Mr. Sandow.  The government cited all of those exhibits at that time as showing that Mr. Sandow lied to various insurance companies, when subsequently applying for agent status, about

5

whether he had ever been a judgment debtor and whether any federal tax liens had ever been filed against him. Mr. Sandow objected, but the trial court allowed the government to refer to all of those documents, the court stating that they were relevant to the question of intent on the conspiracy count included in the insurance fraud case. See Fed. R. Ev. 404(b). On appeal, Mr. Sandow argues that none of that evidence should have been admitted and that, even if its admission was proper, the trial court should have instructed the jury not to use it except for the purposes allowed by Fed. R. Ev. 404(b).

The civil judgments were manifestly relevant to the element of motive in the annuity pledge case. See, e.g., United States v. Noland, 960 F.2d 1384, 1387-88, 1388 n.4 (8th Cir. 1992); see also United States v. Shriver, 842 F.2d 968, 974-75 (7th Cir. 1988). We are frankly unable to comprehend the government's argument concerning the relevance to the insurance fraud case of the civil judgments or the federal tax lien, and we are in fact, and equally frankly, inclined to see that evidence as reflective of piling on by the government. But it was, in any event, harmless error, if it was error, to admit the evidence in question, given the overwhelming evidence of Mr. Sandow's guilt on all counts of the insurance fraud case. We note, too, that any prejudicial effect that the admission of that evidence might have had was greatly blunted by the fact that the trial court did not allow the government to refer to the facts on which the civil judgments and the federal tax lien were based. Mr. Sandow neither objected to the trial court's instructions, moreover, nor offered a jury instruction on that evidence. We see no plain error in the trial court's failure to give a specific instruction on that evidence, and therefore we reject all of Mr. Sandow's arguments with respect to the civil judgments and the federal tax lien.

                                    III.

     Mr. Sandow offered a jury instruction on multiple conspiracies
(rather than the single one charged in the insurance fraud case).  The
trial court refused to give that instruction, stating that
"there [was] not sufficient evidence to support the giving of a[n]
[instruction on a] multiple conspiracy theory."  On appeal, Mr. Sandow
challenges that refusal.    We have read the trial transcript with care.
We see no error in the trial court's conclusion about the insufficiency of
the evidence with respect to multiple conspiracies.


                                    IV.

     The presentence report on Mr. Sandow calculated the total loss to the
victims from the insurance fraud case to be $2,745,412 -- premiums of
$2,000,000 and outstanding claims of $745,412.  Since Mr. Sandow did not
become involved in the events charged in the insurance fraud case until
early 1992, however, the presentence report deducted $114,111 from that
total (apparently reflecting premiums received before 1992), leaving the
amount of $2,631,301 attributable to Mr. Sandow.  Under the federal
sentencing guidelines, a loss to the victims of more than $2,500,000
requires an increase in base offense level of 13 levels.  See U.S.S.G.
§ 2F1.1(b)(1)(N).  The trial court used that increase in determining
Mr. Sandow's offense level for sentencing purposes.


     On appeal, Mr. Sandow contends that the loss to the victims should
have been calculated from the exact premium amounts testified to at trial
-- $1,873,870 -- rather than from the concededly approximate figure of
$2,000,000.  We do not see the point of that argument, since even using the
more precise premium amounts yields a loss to the victims of $2,505,171 --
still more than $2,500,000.  Mr. Sandow further argues, however, that he
should not be held responsible for the premiums collected after he left two
of the four companies in question (to form the third company) and after a
co-defendant formed the fourth company that

                                     7

was involved. Basically, Mr. Sandow reiterates his previous contention that the establishment of the various companies amounted to separate conspiracies rather than a single one.

Under the sentencing guidelines, the calculation of loss to the victims used in determining the offense level of an individual defendant who has participated in a "jointly undertaken criminal activity" is to include "all reasonably foreseeable acts ... of others ... that occurred during the commission of the offense of conviction." See U.S.S.G. § 1B1.3(a)(1)(B) and application note 2, illustration (c)(2); see also U.S.S.G. § 1B1.1, application note 1(l) (definition of "offense" includes "all relevant conduct under § 1B1.3"). We have held, as noted above, that there was no error in the trial court's conclusion that the evidence was insufficient with respect to multiple conspiracies. We also hold, accordingly, that the trial court's determination of the amount of loss to the victims was not clearly erroneous. See, e.g., Kok v. United States, 17 F.3d 247, 250 (8th Cir. 1994).

V.

Under the federal sentencing guidelines, a defendant may receive a decrease in base offense level of two levels if he or she has "clearly" accepted responsibility for the offense. See U.S.S.G. § 3E1.1(a). If the defendant receives that two-level decrease, he or she may receive an additional one-level decrease if he or she "timely" provides complete information to the government, see U.S.S.G. § 3E1.1(b)(1), or "timely" notifies the government of an intention to plead guilty, see U.S.S.G. § 3E1.1(b)(2). The trial court declined to grant any decrease for acceptance of responsibility by Mr. Sandow. On appeal, Mr. Sandow asserts that the trial court improperly denied one or both of the decreases authorized by the sentencing guidelines. We have read the sentencing transcript carefully; the trial court's decision not to grant any decrease for acceptance of responsibility was not clearly

erroneous.  See, e.g., United States v. Walter, 62 F.3d 1082, 1083 (8th Cir. 1995) (per curiam).

## VI.

For the reasons stated, we affirm Mr. Sandow's convictions and his sentence.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.